1   Kelly C. Hunsaker (SBN 168307 / hunsaker@fr.com)
    Enrique D. Duarte (SBN 247523 / duarte@fr.com)
2   FISH & RICHARDSON P.C.
    500 Arguello Street, Suite 500
3   Redwood City, California 94063
    Telephone: (650) 839-5070
4   Facsimile: (650) 839-5071

5   Attorneys for Defendant
    COUPA SOFTWARE INC.

6

7

8

              UNITED STATES DISTRICT COURT

9

          NORTHERN DISTRICT OF CALIFORNIA

10

             (SAN FRANCISCO DIVISION)

11

12   ARIBA, INC.,

13        Plaintiff,

14          v.

15   COUPA SOFTWARE INC.,

16        Defendant.

17

| | |
|---|---|
| ARIBA, INC., Plaintiff, v. COUPA SOFTWARE INC., Defendant. | Case No. 4:12-cv-01484 WHO<br><br>**COUPA'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................. 1

II.    TECHNOLOGY OF THE '165 PATENT ............................................ 1

    A.    Brief Background .................................................................... 1

    B.    The '165 Specification ........................................................... 2

    C.    The '165 Prosecution History ................................................ 4

    D.    The Asserted Claims ............................................................. 5

III.    THE LAW OF CLAIM CONSTRUCTION ...................................... 5

    A.    The "Direct Order Module," "Purchase Order Module," and "Electronic Requisition Form" ............................................. 7

        1.    "direct order module" (All Claims)............................. 8

        2.    "purchase order module" (All Claims) ...................... 10

        3.    "electronic requisition form" (claims 35, 41) ......... 12

    B.    The Means-Plus-Function Limitations (35 U.S.C. § 112(f)) ............................ 14

        1.    "order generating means for deciding between at least one of a purchase card module, a direct order module, and a purchase order module to submit the requisition for fulfillment by a supplier" (Claim 1)...................... 16

        2.    "deciding between at least one of a purchase card module, a direct order module, and a purchase order module to submit the electronic requisition form for fulfillment" (Claims 35, 41) ...................... 19

        3.    "approval path handling means for guiding the requisition record along the determined approval path, wherein the approval path handling means generates a global approval indication based on the commentary entry and in response to the requisition record successfully traversing the approval path" (Claim 1)........................ 20

        4.    "approval path determining means, responsive to the requisition record to approval rules in an approval rules database, for determining an approval path for the requisition record, among various ones of a plurality of possible approvers, required to approve the requisition record based on the commentary entry" (Claim 1) ................. 22

**TABLE OF CONTENTS (Cont'd.)**

5.   "requisition record generating means . . ." (Claim 1) ............................ 24

6.   "electronic receipt generating means . . ." (Claim 1) ............................ 25

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008) ............................................................. 15, 16

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
    672 F.3d 1335 (Fed. Cir. 2012) ............................................................. 14

*Biomedino, LLC v. Waters Techs. Corp.*,
    490 F.3d 946 (Fed. Cir. 2007) ............................................................. 14, 15

*Black & Decker, Inc. v. Robert Bosch Tool Corp.*,
    260 Fed. Appx. 284 (Fed. Cir. 2008) ............................................................. 13

*Blackboard Inc. v. Desire2Learn Inc.*,
    574 F.3d 1371 (Fed. Cir. 2009) ............................................................. 15, 21, 23, 24

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
    412 F.3d 1291 (Fed. Cir. 2005) ............................................................. 14

*Embrex, Inc. v. Serv. Eng'g Corp.*,
    216 F.3d 1343 (Fed. Cir. 2000) ............................................................. 5

*ePlus, Inc. v. Lawson Software, Inc.*,
    700 F.3d 509 (Fed. Cir. 2012) ............................................................. passim

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012) ............................................................. 14, 15, 25

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) ............................................................. 9, 21

*Function Media, L.L.C. v. Google, Inc.*,
    708 F.3d 1310 (Fed. Cir. 2013) ............................................................. 19

*Griffin v. Bertina*,
    285 F.3d 1029 (Fed. Cir. 2002) ............................................................. 21, 25

*Intamin Ltd. v. Magnetar Tech., Corp.*,
    483 F.3d 1328 (Fed. Cir. 2007) ............................................................. 10

*Intergraph Hardware Techs. Co. v. Toshiba Corp.*,
    508 F. Supp. 2d 752 (N.D. Cal. 2007) ............................................................. 20, 25

*IPXL Holdings, LLC v. Amazon.com*,
    430 F.3d 1377 (Fed. Cir. 2005) ............................................................. 22

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ............................................................. 5

COUPA'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
Case No. 4:12-cv-01484 WHO

*Mas-Hamilton Group v. LaGard, Inc.*,
    156 F.3d 1206 (Fed. Cir. 1998)..................................................................19

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008)..................................................................23

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..........................................................6, 16, 19

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
    529 F.3d 1364 (Fed. Cir. 2008)..................................................................10

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)......................................................................6

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)..................................................................15

**Statutes**

35 U.S.C. §112(f)........................................................................... passim

1   **I.      INTRODUCTION**

2          This is a patent case involving an upstart software company defending itself against a

3   competitor's attempt to impede its rising success.  At issue is U.S. Patent No. 7,117,165 (the "'165

4   patent"), a patent filed during the hey-day of the 1990s dot-com era that discloses a specific

5   electronic procurement system—i.e., a system that employees can use to request things like

6   staplers, paper, and pencils.  At the time the patent was filed, procurement had generally been

7   done "through paper-based processes," and the patent sought to put together the various processes

8   into an "integrated, enterprise-wide solution."  [1:20-34[1].]  The patent issued in 2006 after seven

9   years of prosecution in the Patent Office, after Ariba had narrowed the claims multiple times.

10         There are two central themes to the present claim construction dispute.  First, Coupa

11  proposes constructions that account for the distinction the '165 patent made between a requisition

12  and a purchase order.  Ariba, on the other hand, proposes constructions that blur that distinction.

13  Second, the patent contains claims drafted in "means-plus-function" format.  Means-plus-function

14  claims trigger special rules allowing a patentee to claim its invention in terms of the *function* it

15  performs, but as a *quid-pro-quo*, are limited to the particular *structures* disclosed in the patent

16  specification for performing that function.  If there is insufficient disclosure, the claim is invalid,

17  since a patentee cannot claim to itself *all* ways of performing a function.

18  **II.     TECHNOLOGY OF THE '165 PATENT**

19         **A.      Brief Background**

20         Broadly speaking, procurement is the process an organization uses to purchase items.  It

21  generally involves an employee filling out a requisition form to request approval to purchase

22  items, obtaining those approvals, and then ordering the approved items.

23         A company can place an order in at least three ways.  For example, the company can send

24  a purchase order to a supplier.  A purchase order is a contractual offer to purchase items, and thus

25  must set out the terms and conditions of that offer and a purchase order number (an ID for the

26  purchase order).  If the supplier accepts, it typically ships the requested items along with an

27  ─────────────────

28  [1]      Unless otherwise noted, citations in the form XX:YY refer to the '165 Patent, col. XX, ln. YY.

1   invoice for payment.  The invoice will refer to the purchase order number so the buying company

2   can match the invoice to the corresponding purchase order.  This is crucial for large companies so

3   they can avoid paying invoices for orders they did not actually make.

4         Where there are periodic or repetitive purchases of the same set of materials, e.g., staples,

5   pencils, paper, etc., a company may enter into a standing agreement with a supplier.  The company

6   and supplier agree beforehand what items are covered and the terms and conditions that will apply,

7   eliminating the need for purchase orders.  With such an agreement, the supplier can send periodic

8   invoices covering all orders placed under the agreement within a set period of time, e.g., within a

9   quarter, but without the overhead of matching those invoices to purchase orders.

10        Yet another way to place orders involves using purchase cards, which function in some

11   respects like a credit card.  Purchase cards were introduced at least as early as 1986 as part of a

12   Federal Government pilot test to save costs for small purchases (Dkt. No. D12-2 at 2) and are well

13   suited for one-off small transactions that may not be covered by a standing agreement.  With

14   purchase cards, a company pays for the order at the time of purchase, similar to how an individual

15   may use a credit card to pay for items at a check-out stand, over the phone, or over the Internet

16   (e.g., at Amazon.com).  This renders invoices, and the associated cost of having to match invoices

17   to purchase orders, unnecessary.

18       **B.**       **The '165 Specification**

19        Procurement in the '165 patent starts with a requisition, which requests approval to

20   purchase goods or services and may contain multiple line items from different suppliers.  [7:37-38;

21   19:30-32; 23:52-57.]  Figure 3 shows "how a requisition is processed in a typical embodiment,

22   from requisition creation to approval, to receipt of requisitioned goods/services, and to

23   reconciliation."  [3:18-21.]  The system first creates a requisition using the steps indicated in box

24   302 of Figure 3.  [3:21-23.]  For example, a "wizard 202, 302 'walks' an employee through a

25   number of questions to guide him through the process of making a purchase."  [3:30-32.]

26        The system then handles the requisition approval process.  "When an employee has

27   finished filling out a requisition and asked to submit it, the system will perform [a number of]

28   checks before actually submitting the requisition for approval."  [10:23-26.]  For example, "the

1   system checks the approval rules of the company, decides which users need to approve the

2   request, and in what order, and then notifies the first approver that there is a requisition waiting for

3   attention." [10:61-64.] The '165 patent mentions that "approval rules are defined as part of the

4   installation process" (16:39-42), but does not actually disclose a set of approval rules. [Ex. [2] 2,

5   Deposition of Michael I. Shamos ("Shamos Tr."), at 134:21-135:3 (the patent "doesn't disclose

6   the rules themselves").]

7          After approval of a requisition, the system chooses which ordering module to use. "An

8   ordering module is the piece of the system that takes a fully approved requisition and submits it

9   for fulfillment." [19:26-27.] "When a requisition has been fully approved, the system will: . . .

10  [c]heck the requisition to determine which suppliers are involved, and . . . [c]hoose the preferred

11  ordering module for each of those suppliers and use it to transmit the order." [19:28-34.] "The

12  three ordering modules are a Purchasing Card Module, Direct Order Module, and a Purchase

13  Order module." [19:35-36.]

14         "The Purchasing Card ordering module supports the use of purchasing cards as a payment

15  mechanism." [19:38-39.] "Purchasing card transactions are reconciled on some regular basis with

16  the bank that issued the purchasing card." [19:43-45.] A purchase card transaction is assigned a

17  "P-Card Order #" that is "used to identify the transaction in communications between the supplier

18  and the system." [20:29-32.]

19         "The direct order module is an ordering module that supports communication of orders

20  directly between the buyer and supplier, without storing the requisition in an ERP system."

21  [20:64-67.][3] Using this module, the system of the '165 patent sends the requisition directly to the

22  supplier because they have a "direct order agreement," that is, an agreement that "includes terms

23  and conditions, and specifies the frequency of billing." [21:1-3.] Separate purchase orders are not

24  generated with the direct order module. Instead, if the direct order module is used, the system

25

26  [2]    Unless otherwise noted, all exhibits herein refer to exhibits attached to the Declaration of
        Enrique D. Duarte ("Duarte Decl.").
27  [3]    ERP stands for Enterprise Resource Planning; an ERP system is a software system that
        handles business operations including procurement. *See, e.g.,* ALEXIS LEON, ENTERPRISE
28      RESOURCE PLANNING 14 (2nd ed. 2008).

1   "[t]ransmits *the requisition* directly to the supplier via fax or e-mail." [21:15-16 (emphasis

2   added).]

3         Finally, "[t]he purchase order module is an ordering module whose case results in a

4   purchase requisition in the ERP system." [21:26-27.] "Once the requisition is in ERP," an agent

5   "can manipulate it with standard ERP operations," for example, he can "autocreate[] a purchase

6   order from the requisition, print[] it out, an[sic] send[] it to the supplier for fulfillment." [21:29-

7   34.] The '165 patent discloses a "requisition adapter" (an ERP adapter) that "pushes fully-

8   approved requisitions into the ERP, where they are converted into Purchase Orders on the ERP

9   system." [23:52-55.] Each line item of an approved requisition receives its own "purchase order

10  number" in the ERP system. [*See* 23:55-57.]

11        According to the '165 patent, "the only time the system generates a purchase order," as

12  opposed to an ERP system generating a purchase order, is when the system is "stand-alone," i.e.,

13  "when there is no ERP adapter present." [26:30-38.] In that case, features of the system are

14  available "*only* to provide basic functionality…." and the system "[p]rovides the ability to print

15  out purchase orders and transmit them to the supplier." [*Id.*] Such "printed purchase orders

16  include standard notes (such as the supplier's terms and conditions) and a purchase order number."

17  [26:34-37.]

18        After an order is placed and the items are received, the requester acknowledges receiving

19  them and the system generates a receipt. [*See* 4:60-65.]

20        **C.    The '165 Prosecution History**

21        The '165 patent was filed October 28, 1999, claims priority to a provisional application

22  filed on April 28, 1997, and ultimately issued on October 3, 2006.

23        The U.S. Patent & Trademark Office ("USPTO") rejected the initial set of claims in 2002

24  as obvious based on three prior art patents: U.S. Patent No. 5,319,542 ("King patent"), U.S. Patent

25  No. 5,758,327 ("Gardner patent"), and U.S. Patent No. 5,315,504 ("Lemble patent"). [Dkt. No.

26  44-3 at ARICOU00000205-12 (Jul. 5, 2002 Office Action, at 6-13).] In response, Ariba added

27  new claims and amended the original ones to require that a requisition record include a

28  "commentary entry" and that approvals be "based on the commentary entry." [*Id.* at

4

COUPA'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
Case No. 4:12-cv-01484 WHO

1    ARICOU00000235-36 (Oct. 15, 2002 Am. at 14-15).] The USPTO maintained its rejection, and

2    after some back and forth, Ariba again amended its claims, this time adding limitations such as an

3    "electronic receipt" and "transmitting the electronic requisition form." [Ex. 1 (Apr. 10, 2003 Am.

4    at 2).] Again, the USPTO maintained its rejection over the same prior art. More back and forth

5    ensued, and Ariba eventually cancelled some claims and amended others (again). Ariba added

6    more claim limitations to try to overcome the prior art; for example it added a "wherein" clause

7    requiring the receipt to indicate acceptance or rejection of a received resource, specified that the

8    requisition form is transmitted "directly" to at least one of the suppliers, and added a "facilitating

9    payment" limitation. [Ex. 1 (Mar. 31, 2004 Am. at 2, 10-13).] The USPTO remained

10    unconvinced and again rejected Ariba's claims.

11       Finally, Ariba amended every independent claim to explicitly require "deciding between"

12    three different ordering modules – the Purchase Card module, Direct Order module and Purchase

13    Order module – arguing that the King, Gardner, and Lemble patents did not suggest "choosing

14    between multiple order modules to fulfill an order." [Ex. 1 (Jan. 13, 2005 Am. at 3, 10, 12, 14-15,

15    20).] With this addition, the USPTO finally allowed the claims.

16       **D.**     **The Asserted Claims**

17       The '165 patent has three independent claims. Independent claim 1 is a system claim that

18    generates an electronic requisition record, determines an approval path for that record, guides the

19    record along that path, decides which ordering module to use, and ultimately generates a receipt.

20    This claim is written in means-plus-function format, which has special statutory requirements

21    under 35 U.S.C. §112(f). Independent claims 35 and 41 are "computer-readable medium" claims

22    that are similar to claim 1, except they omit the approval path limitations, and recite the additional

23    limitation of transmitting a requisition form directly to one or more suppliers.

24    **III.**     **THE LAW OF CLAIM CONSTRUCTION**

25       Courts construe claims as a matter of law. *Markman v. Westview Instruments, Inc.*, 517

26    U.S. 370, 391 (1996). "The construction of claims is simply a way of elaborating the normally

27    terse claim language in order to understand and explain, but not to change, the scope of the

28    claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (internal

1  quotation and citation omitted).  Claim construction involves considering "the claims themselves,

2  the remainder of the specification, the prosecution history, and extrinsic evidence concerning

3  relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips v.*

4  *AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).

5        The court in *Phillips* emphasized the need to "avoid importing limitations from the

6  specification into the claims." *Id.* at 1423.  It is a "bedrock principle" of patent law that "the

7  claims of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at

8  1312.  Claims "must be read in view of the specification, of which they are a part." *Id.* at 1315.  In

9  fact, the Federal Circuit reiterated that the specification "is always highly relevant to the claim

10 construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a

11 disputed term." *Id.*  "Ultimately, the interpretation to be given a term can only be determined and

12 confirmed with a full understanding of what the inventors actually invented and intended to

13 envelop with the claim.  The construction that stays true to the claim language and most naturally

14 aligns with the patent's description of the invention will be, in the end, the correct construction."

15 *Id.* at 1316.  This led the Federal Circuit to conclude that "it is therefore entirely appropriate for a

16 court, when conducting claim construction, to rely heavily on the written description for guidance

17 as to the meaning of claims." *Id.* at 1317.  Claim construction also requires consideration of the

18 prosecution history, which informs "the meaning of claim language by demonstrating how the

19 inventor understood the invention and whether the inventor limited the invention in the course of

20 prosecution, making the claim narrower than it would otherwise be." *Id.*

21        Extrinsic evidence "can help educate the court regarding the field of the invention and can

22 help the court determine what a person of ordinary skill in the art would understand claim terms to

23 mean," but it "is unlikely to result in a reliable interpretation of patent claim scope unless

24 considered in the context of the intrinsic evidence." *Id.* at 1319.  Such extrinsic evidence may take

25 the form of expert testimony, dictionaries, technical treatises, and articles. *Vitronics Corp. v.*

26 *Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).  Courts may not, however, rely on

27 extrinsic evidence to contradict or vary the meaning of claims provided by the intrinsic evidence.

28 *Phillips*, 415 F.3d at 1318.  "[A] court should discount any expert testimony that is clearly at odds

1  with the claim construction mandated by" the intrinsic evidence.  *Id.* at 1318 (citations omitted).

2  Indeed, an expert's testimony "may only be relied upon if the patent documents, taken as a whole,

3  are insufficient to enable the court to construe disputed claim terms.  Such instances will rarely, if

4  ever, occur."  *Vitronics*, 90 F.3d at 1585.

5  **II.     TERMS OF THE '165 PATENT**

6
7         **A.     The "Direct Order Module," "Purchase Order Module," and "Electronic
              Requisition Form"**

8         There are two overarching issues to keep in mind when construing the terms "direct order

9  module," "purchase order module," and "electronic requisition form."

10        The first issue focuses on drawing a clear line between a "direct order module" and a

11  "purchase order module" to help the jury distinguish one from the other and remain true to Ariba's

12  claim amendment that garnered allowance of the patent.  Coupa proposes constructions to

13  establish this distinction: a purchase order module transmits a requisition to an ERP system where

14  purchase orders are generated for each supplier; a direct order module skips the process of

15  generating a purchase order and instead transmits the requisition form directly to one or more

16  suppliers, bypassing the ERP system altogether.

17        The second issue is related to the first, but with the focus shifted the output of the ordering

18  modules, and not the modules themselves.  Claims 35 and 41 recite "transmitting the electronic

19  *requisition form* directly to at least one supplier," i.e., the step performed by the direct order

20  module.  Coupa proposes a construction for "electronic requisition form" that helps the jury

21  understand the distinction between a requisition form and a purchase order.  Ariba, on the other

22  hand, proposes a construction that blurs this distinction and treats a requisition form and a

23  purchase order as one-and-the-same.  This directly contravenes the intrinsic evidence.

24
25
26
27
28

1.      "direct order module" (All Claims)

| Ariba's Proposed Construction | Coupa's Proposed Construction[4] |
|---|---|
| Software for generating an order against a direct order agreement. | An ordering module that ~~acts on~~ transmits a fully approved requisition ~~and transmits the requisition~~ directly to a supplier based on a direct order agreement, without storing the requisition in an ERP system or generating a purchase order. |

The '165 patent explains and defines a "direct order module." "The direct order module is an ordering module that supports communication of orders directly between the buyer and supplier, without storing the requisition in an ERP system." [20:64-67.] The direct order module is used when there is a direct order agreement in place with a supplier (21:4-14), and therefore will "[t]ransmit[] the requisition directly to the supplier via fax or e-mail" (21:15-16). Claim 35 recites similar language: "transmitting the electronic requisition form directly to at least one of the plurality of suppliers based on a direct order agreement between a company employing the user and the at least one supplier." [Claim 35 (emphasis added); *see also* Claim 41 (reciting a similar limitation).] Finally, it is an "ordering module" (19:35-36), which "is the piece of the system that takes a fully approved requisition and submits it for fulfillment" (19:26-27). Because Coupa's proposed construction is aligned with the claim language and tracks the patentee's definition for a direct order module, it is the appropriate construction to adopt.

Ariba's construction ignores the definition and description set forth in the patent. It would also incorrectly allow a single ordering module to satisfy both the "direct order module" and "purchase order module" limitations, even though it is undisputed that the claimed system cannot use both the direct order module and the purchase order module for a single order. [Declaration of Dr. Shamos ("Shamos Decl."), at ¶ 27 ("a DO module and a PO module are mutually exclusive of one another").][5] For example, Ariba contends that a "direct order module" is "software for generating an order against a direct order agreement," and also contends that a purchase order module is "software for generating a purchase order." Under Ariba's constructions, a single

---

[4]   Coupa has revised some of its proposed construction to narrow the disputed issues. Underlined language indicates additions, and strikethroughs indicate deletions.
[5]   Dr. Shamos' Declaration was attached to Ariba's Opening Brief as Dkt. No. 44-4.

1    software module that generates a purchase order would qualify as a purchase order module if

2    made against a direct order agreement, and would also qualify as a direct order module.  In fact,

3    Ariba's contention is that a "purchase order" and a "direct order" are identical, except for

4    "whether the order is backed by a direct order agreement." [Ariba's Br. at 24:17-18.]  This

5    contravenes the express language of the claims (i.e., "deciding between" the modules), the

6    disclosures in the patent (describing two distinct modules), the prosecution history (requiring

7    separate modules) and Ariba's expert's understanding of the claims (the purchase order module

8    and direct order module are mutually exclusive (Shamos Decl. at ¶ 27)), and is therefore wrong.

9        In addition, Ariba's construction—"software for [doing X]"—runs afoul of 35 U.S.C. §

10   112(f) by creating a purely functional definition with no structural boundaries in an attempt to

11   cover *any* software that performs the stated function.  *ePlus, Inc. v. Lawson Software, Inc.,* 700

12   F.3d 509, 519 (Fed. Cir. 2012) (invalidating system claims where there was "nothing in the

13   specification to help cabin the scope of the functional language in the means for processing

14   element: The patentee has in effect claimed everything that generates purchase orders under the

15   sun."); *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340-41 (Fed. Cir. 2008) ("Simply

16   reciting 'software' without providing some detail about the means to accomplish the function is

17   not enough."); *see also infra* (discussing the legal standard for claims subject to § 112(f));

18   Lemley, Mark A., Software Patents and the Return of Functional Claiming (July 25, 2012),

19   Stanford Public Law Working Paper No. 2117302, at 3 ("It is broad functional claiming of

20   software inventions that is arguably responsible for most of the well-recognized problems with

21   software patents."), 5 (proposing "in Part IV . . . that the problem could be solved by applying the

22   rules of means-plus-function claims to software")[6].  It should therefore be rejected for at least this

23   additional reason.

24       In sum, the proper construction of a "direct order module" must distinguish between that

25   module and a "purchase order module."  Thus, Coupa's proposed construction should be adopted.

26

27

28   [6]   This publication is attached to the Duarte Decl. as Ex. 3.

## 2.   "purchase order module" (All Claims)

| Ariba's Proposed Construction | Coupa's Proposed Construction[7] |
|---|---|
| Software for generating a purchase order. | An ordering module that ~~acts on~~ <u>transmits</u> a fully approved requisition ~~and transmits the requisition~~ to an ERP <u>system</u> ~~adapter, rather than to a supplier,~~ for generating a purchase order |

The '165 patent explains and defines a "purchase order module."  "The purchase order module is an ordering module whose case results in a purchase requisition in the ERP system." [21:26-27.]  Thus, unlike the direct order module, the purchase order module does not transmit the requisition to a supplier, but rather to an ERP adapter.  The ERP adapter, in turn, "pushes fully-approved requisitions into the ERP, where they are converted into Purchase Orders on the ERP system."  [23:52-57.]  In other words, the purchase order module is not what actually generates purchase orders—that is done by an ERP system after it receives fully-approved requisitions from the purchase order module.  Coupa's construction is consistent with this disclosure, while Ariba's construction is not.

Ariba argues, without explanation, that Coupa's proposed construction excludes a stand-alone embodiment.  [Ariba's Br. at 21:9-11; 22:11-21.]  First, there is no legal requirement that claims cover every embodiment in the specification.  *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("Our precedent is replete with examples of subject matter that is included in the specification, but is not claimed." (citations omitted)); *Intamin Ltd. v. Magnetar Tech., Corp.*, 483 F.3d 1328, 1337 (Fed. Cir. 2007) ("a claim need not cover all embodiments").  Second, Ariba's argument lacks a factual basis.  The patent's description of a stand-alone embodiment is a cursory reference at the end of the patent, separate and apart from the patent's description of the purchase order module.  [26:30-42; Cf. 21:25-35.]  Thus, the stand-alone embodiment does not use the purchase order module at all.  To the contrary, it includes "features of the system that are available <u>only</u> to provide <u>basic functionality</u> when the system is stand-alone: when there is no ERP adapter present," such as the "ability to print out purchase

1  orders and transmit them to the supplier".  [26:30-35 (emphasis added).]  This is insufficient to

2  rebut the patent's explicit definition stating that the "purchase order module is an ordering module

3  whose case results in a purchase requisition in the ERP system" (21:26-27) and strongly suggests

4  that the purchase order module does **not** contain the ability to generate purchase orders.

5       Ariba's proposed construction covers any software "for generating a purchase order,"

6  regardless of how the software does it, and even if the software does not itself generate the

7  purchase order.  This is incorrect for the reasons discussed above with respect to functional

8  claiming in the "direct order module."  *See also infra* (discussing the legal standard for means-

9  plus-function claims).

10       In addition, Ariba's proposed construction expands the scope of the claims to cover

11  functionality provided in the '165 patent by the ERP system, i.e., that software in an ERP system

12  can qualify as a purchase order module.  [Shamos Decl. at ¶ 23(b) ("when a PO module is selected

13  that can refer to the generation of a purchase order through an ERP system or outside an ERP

14  system").]  This is wrong because the patent consistently and repeatedly described the purported

15  invention (i.e., "the system") as integrating with a pre-existing ERP system, not that parts of that

16  ERP system are included within the purported invention.  [*See* 5:1-2 (receipts are "stored in the

17  system and not integrated with the ERP"); 6:31-49 ("Adapters . . . are software modules that link

18  the system to the rest of the enterprise.  . . . Significant adapters are adapters 804 to the ERP

19  system in the company."); *see also* 23:45-24:52 (describing "the system" pulling data from an

20  ERP system); claims 18, 20 (including "adaptor means" that interface with an ERP system).]  The

21  patent expressly defined the purchase order module as transmitting a requisition to an ERP

22  adapter, not as the software within the ERP system that generates purchase orders.  Thus, Ariba's

23  construction should be rejected, and Coupa's proposed construction should be adopted.

24

25

26

27

---

28  7  To streamline matters for the Court and reduce the number of disputed issues, Coupa has
   revised its construction as indicated.

### 3.   "electronic requisition form" (claims 35, 41)

| Ariba's Proposed Construction | Coupa's Proposed Construction[8] |
|---|---|
| An electronic form for requesting goods or services. | ~~A structured document with predefined areas for entering or changing information, wherein the document both~~ <u>An electronic form that</u> constitutes a request for approval to purchase <u>goods or services</u> ~~items from one or more suppliers~~, and lacks a purchase order number and terms and conditions of an offer. |

The parties dispute whether a requisition form can also be a purchase order.  Ariba seeks to expand the scope of a "requisition form" so that it covers a purchase order.  It does so despite clear recognition in the '165 patent that a requisition and purchase order are two different things.  It does so in an attempt to ensnare Coupa's product, which never transmits requisitions to suppliers but instead transmits only purchase orders.  [*See, e.g.,* Ex. 4 (Ariba's Infringement Claim Chart) at 57, 68 (alleging that "Coupa e-Procurement Software transmits the requisition to the supplier for fulfillment *as a purchase order*" (emphasis added)); *see also* Dkt. No. 12 (Coupa's Answer) at ¶ 64 (explaining that Coupa's solution "processes requisition forms and uses them to create one or more purchase orders, but it is always the purchase orders and not the requisition form that are electronically transmitted to suppliers.").]  Coupa proposes a construction that correctly distinguishes between a requisition form and a purchase order.

According to claim 35, the requisition form is generated based on a user's responses to a number of questions.  This lines up with the specification's disclosure of a "requisition record."  [*See, e.g.,* 8:9-55 (summarizing the fields of a requisition record); 9:35-65 (summarizing the fields of a line item in a requisition record).]  Next, the claim recites deciding between what ordering module to use, and then "transmitting the electronic requisition form directly to at least one of the plurality of suppliers based on a direct order agreement."  The reference to the direct order agreement and "direct" transmission corresponds to the direct order module for reasons explained in the previous sections.  A requisition can include multiple line items from multiple suppliers, and the claim specifies that the requisition form—in the singular—is transmitted to "at least one

---

[8]   To streamline matters for the Court and reduce the number of disputed issues, Coupa has revised its construction to focus on the meaning of a requisition, and not a "form".

1    supplier."  In other words, the requisition can be transmitted to multiple suppliers, something that

2    cannot be done with a purchase order.  In contrast, when a purchase order is used, its purchase

3    order number is associated with a line item in a requisition, not the entire requisition.  [23:55-57

4    ("store PO numbers as extrinsic data fields associated with each line item").]

5         Ariba argues that the specification "repeatedly uses the term 'requisition' interchangeably

6    with 'order.'"  [Ariba's Br. at 25:1-2 (citing only 7 lines from the patent).]  Nothing could be

7    further from the truth.  The specification consistently uses the terms "requisition" and "order" to

8    refer to different things.  For example, "requisition" refers to a user's initial request for approval to

9    purchase items (*e.g.*, 7:18-20, 7:36-40, 3:21-23), but when it comes to placing a purchase order,

10   the specification distinguishes between the two (21:25-34 ("agent typically autocreates a purchase

11   order from the requisition"), 23:53-57 ("fully-approved requisitions . . . are converted into

12   Purchase Orders on the ERP system," and purchase order numbers are "associated with each line

13   item [of the requisition]")).  The only time that the patent discloses transmitting a requisition to a

14   supplier is in the context of a "direct order," not a "purchase order."  The patent explains that a

15   direct order module "[t]ransmits the requisition directly to the supplier," and that "[a]ll requisitions

16   transmitted to the supplier are recorded in the audit trail database."  [21:15-18.]  The claims

17   similarly recite "transmitting the electronic requisition form directly to at least one supplier," as

18   opposed to transmitting a purchase order.  [Claims 35, 41.]  Thus, an appropriate construction in

19   this context is one that clarifies that an "electronic requisition form" lacks the purchase order

20   number[9] and terms and conditions of an offer, since a requisition form is not a purchase order.

21        "The surrounding claim language provides an important consideration for construing a

22   particular term within a claim."  *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 Fed. Appx.

23   284, 287 (Fed. Cir. 2008) (citing *Phillips*, 415 F.3d at 1314).  Here, claim 35 recites both

24   "electronic requisition form" and "purchase order," raising a presumption that those terms have

25   ─────────────

26   [9]   Ariba does not contest that a requisition lacks a purchase order number.  [*See generally*,
        Ariba's Br. at 24-25.]  That is likely because Tables 1 and 2 of the patent disclose the fields of
27      a requisition and its line items, and none of those fields include a purchase order number.
        [8:8-50; 9:35-66.]  Indeed, Table 1 shows that a requisition has its own unique ID (8:16-8),
28      while other parts of the patent disclose each purchase order having a purchase order number
        that is associated with a line item of a requisition (23:55-57).

                                        13
                                                  Case No. 4:12-cv-01484 WHO

1  different meanings.  *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349

2  (Fed. Cir. 2012) ("when different words are used in separate claims, they are presumed to have

3  different meanings" (citation omitted)).

4      Finally, Ariba's proposed construction is too generic and strips the term of its essential

5  meaning, because it does not specify that a requisition form is a request *for approval* to purchase

6  items.  The '165 patent describes a requisition in the context of an automated approval process.

7  [*E.g.*, 10:23-26 ("the system will perform the following checks before actually submitting the

8  requisition for approval"); *see generally* 7:18-10:55; Fig. 3.]  Table 1 of the patent summarizes the

9  fields of a requisition, and includes an "Approved Date" field specifying the "[d]ate and time on

10  which the requisition was fully approved."  [8:9-50 (intrinsic field 8); *see also* 7:8 ("An intrinsic

11  field is a field that the system expects to find.").]  Without the words "for approval," Ariba's

12  construction would cover purchase orders, which as explained above, is incorrect.

13      **B.    The Means-Plus-Function Limitations (35 U.S.C. § 112(f))**

14      The parties agree that several of the claim terms at issue are drafted in "means-plus-

15  function" form.  35 U.S.C. § 112(f).  When a patentee claims a generic "means" for implementing

16  a given function, special narrowing rules apply to limit the scope of the claim to cover only those

17  specific structures disclosed in the patent specification, and their equivalents.  *Ergo Licensing,*

18  *LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1363 (Fed. Cir. 2012).   Construction of a means-

19  plus-function claim limitation therefore requires a two-step process: "first identify the function of

20  the limitation; . . . then look to the specification and identify the corresponding structure for that

21  function."  *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007).

22      If the patent fails to disclose adequate structure for performing the recited function, it

23  "amounts to impermissible pure functional claiming," and the claim including that limitation is

24  invalid for indefiniteness under 35 U.S.C. § 112(b).  *Ergo Licensing*, 673 F.3d at 1363.  "To meet

25  the definiteness requirement, structure disclosed in the specification must be clearly linked to and

26  capable of performing the function claimed by the means-plus-function limitation."  *Default Proof*

27  *Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1299 (Fed. Cir. 2005).  If a

28  patent specification simply repeats the <u>function</u> recited in a means-plus-function claim limitation,

COUPA'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
Case No. 4:12-cv-01484 WHO

1   without also disclosing specific structure for performing the function, the limitation cannot be

2   construed and is invalid as indefinite.  *Biomedino*, 490 F.3d at 952-53.

3          It is legally insufficient that a person of ordinary skill in the art at the time of the alleged

4   invention knew or could figure out an algorithm to implement the function; under § 112(f), the

5   "indefiniteness inquiry is concerned with whether the bounds of the invention are sufficiently

6   demarcated, not with whether one of ordinary skill in the art may find a way to practice the

7   invention."  *ePlus,* 700 F.3d at 519; *see also Ergo Licensing*, 673 F.3d at 1364 ("Although one of

8   skill in the art may have been able to find a structure that would work, that does not satisfy §

9   [112(f)].");  *Blackboard Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009) ("That

10  ordinarily skilled artisans could carry out the recited function in a variety of ways is precisely why

11  claims written in 'means-plus-function' form must disclose the particular structure that is used to

12  perform the recited function.").

13         A special situation arises when, as in the present case, the corresponding structure for a

14  means-plus-function limitation includes software running on a general purpose computer.  In such

15  a circumstance, the Federal Circuit has consistently held that the required "structure"

16  corresponding to the claimed function must also include the specific <u>algorithm</u> by which the

17  computer performs the claimed function.  *Aristocrat Techs. Australia Pty Ltd. v. Int' l Game*

18  *Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("The corresponding structure for a § [112(f)] claim

19  for a computer-implemented function is the algorithm disclosed in the specification."); *WMS*

20  *Gaming, Inc. v. Int' l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999); *Ergo Licensing*, 673

21  F.3d at 1364 ("Requiring disclosure of an algorithm properly defines the scope of the claim and

22  prevents pure functional claiming."); *Blackboard*, 574 F.3d at 1385.

23         The Federal Circuit has explained the reason for this additional requirement as follows:

24  "For a patentee to claim a means for performing a particular function and then to disclose only a

25  general purpose computer as the structure designed to perform that function amounts to pure

26  functional claiming.  Because general purpose computers can be programmed to perform very

27  different tasks in very different ways, simply disclosing a computer as the structure designed to

28  perform a particular function does not limit the scope of the claim to 'the corresponding structure,

1  material, or acts' that perform the function, as required by [35 U.S.C. § 112(f)]."  *Aristocrat*, 521

2  F.3d at 1333.  Therefore, in construing a means-plus-function limitation that is implemented by a

3  computer, it is necessary for the Court to determine what computer-implemented algorithm is

4  disclosed in the patent for performing the recited function.  *Id.*  If no specific algorithm is "clearly

5  linked" by the patent specification to performing the function recited in a means-plus-function

6  limitation, the patent fails to disclose the structure necessary for claim construction, and the claim

7  is indefinite as a matter of law.  *See id.*, at 1330-38.

8      1.  **"order generating means for deciding between at least one of a purchase
          card module, a direct order module, and a purchase order module to
9          submit the requisition for fulfillment by a supplier" (Claim 1)**

| Ariba's Proposed Construction | Coupa's Proposed Construction |
|---|---|
| **Function**: Deciding between a set of ordering modules, the set including at least one purchase card module, one direct order module, and one purchase order module, where the chosen module or modules is/are used as part of the process to submit an order for one or more line items.<br><br>**Structure**:  [*See* Dkt. No. 39-1 (Jt. Claim Construction Chart) at 1-2.] | **Function**: a computer choosing only one module to submit the requisition for fulfillment by a supplier, wherein the computer chooses from among at least a purchase card module, a direct order module, and a purchase order module<br><br>**Structure**: There is insufficient structure under *Blackboard*, 574 F.3d at 1371 to support the recited function. |

17      The parties generally agree that the order generating means involves choosing from among

18  at least three ordering modules, but dispute whether it may choose more than one of these modules

19  for a single order.  For the reasons explained below, it may only choose one such module.

20          **a.      The Function**

21      Because this is a means-plus-function limitation, the first thing to construe is the function.

22  As always, we first turn to the claim language.  *See, e.g., Phillips*, 415 F.3d at 1312 ("we look to

23  the words of the claims themselves . . . to define the scope of the patented invention" (citation

24  omitted)).  The plain meaning of the phrase "deciding between" multiple choices suggests that

25  only one choice is selected, not multiple ones.  For example, if someone is "deciding between" a

26  sedan, an SUV, and a mini-van to buy, they will pick only one of them, not two or three of them.

27      The specification discloses that the system chooses only one module for any given order.

28  In particular, under the section titled "Ordering Modules," the '165 patent discloses that "[w]hen a

1    requisition has been fully approved, the system will . . . [c]heck the requisition to determine which

2    suppliers are involved, and . . . [c]hoose the preferred ordering module *for each of those suppliers*

3    and use it to transmit the order." [19:25-34.] Critically, the specification uses the singular tense to

4    describe the chosen "preferred ordering module" and then using "***it***" to transmit the order. [*See*

5    *also* 4:49-53 ("determine the preferred method of ordering . . . and use ***that*** method for

6    transmitting" (emphasis added)).] There is no disclosure in the patent of using multiple ordering

7    modules to submit a single order for fulfillment from a single supplier. Moreover, during the

8    prosecution of the patent application, the patentee stressed that the prior art purportedly did not

9    disclose a "decision making process to choose a preferred ordering method," again, using the

10   singular tense. [Ex. 1 at ARICOU000529-530.] Even Ariba's expert agrees that only one module

11   can be used for transmitting an order. [Shamos Tr., at 66:3-11 ("the actual transmission is done by

12   one module").] Thus, the intrinsic evidence supports Coupa's construction: "deciding between"

13   means choosing only one module for a given order.

14       Ariba argues that the "at least one" language in the claim supposedly means that more than

15   one module may be chosen. [Ariba's Br. at 2-3.] But the "at least one" phrase merely reflects that

16   there can be more than one supplier for multiple line items in a requisition from which to "decide

17   between," not that more than one module can be chosen for the same order. Ariba then argues that

18   a requisition can contain multiple line items, and a different module may be chosen for each line

19   item. [*Id.* at 3-4.] In any event, when the specification refers to choosing a preferred module, it

20   refers to a choice made "for each" supplier in a requisition. [19:30-34.] Thus, the "deciding

21   between" limitation refers to a decision made for a supplier, not the compilation of decisions made

22   for a requisition that involves multiple suppliers.

23       Ariba next argues without support that a purchase card module can be "chosen together

24   with either a DO module or a PO module." [Ariba's Br. at 4:11-12.] But the specification does

25   not disclose such a combination. In fact, the language Ariba cites to supports the opposite

26   conclusion because it specifies that when a purchase card cannot be used, the system "chooses a

27   different ordering module." [20:5-8 ("Ensure that the supplier accepts p-cards. If not, chooses a

28   different ordering module."); 20:9-12 ("If the supplier has a ghosted p-card number" or "the

                                           17              COUPA'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
                                                           Case No. 4:12-cv-01484 WHO

1   employee has a p-card number: uses it.  Otherwise, chooses another ordering module.”); 20:13-5

2   (“If [the amount of the purchase] exceeds the per-transaction limit on the purchasing card, then

3   chooses some other ordering module.”).]  This language strongly suggests that if a purchase card

4   is used, then the system will <u>not</u> choose a different ordering module.  Otherwise, there is no

5   support for the claimed function of combining multiple ordering modules, and the “chooses a

6   different ordering module” language in the specification is superfluous.  Moreover, as Ariba’s

7   expert admits, a purchase card module can itself transfer an order, so it does not actually have to

8   be combined with another ordering module.  [Shamos Tr. at 77:5-6 (“Q. And the p-card module

9   can be used to transfer an order; correct?  A. Yes, you could.”); 94:4-8.]

10      Ariba also proposes construing the phrase “to submit the requisition for fulfillment by a

11   supplier” to mean “where the chosen module or modules is/are *used as part of the process* to

12   submit an order for one or more line items,” while Coupa proposes that no construction for that

13   phrase is necessary.  Ariba is silent on this point, and rightfully so.  Coupa can only surmise that

14   Ariba is trying to broaden the claim by referring to modules being “used as part of” some vague

15   “process.”  Given that Ariba offers no support for its proposed phrase, it should be rejected.

16                **b.        There is Insufficient Corresponding Structure**

17      After construing the function, the next step is to determine the corresponding structure

18   disclosed in the patent, if any exists.  Here, there is insufficient structure to support either party’s

19   proposed function, rendering claim 1 invalid pursuant to § 112(f).  Ariba only offers structure for

20   its proposed function, not Coupa’s.  Ariba contends that the patent discloses whether or not to use

21   a purchase card module, and then deciding between a purchase order module and direct order

22   module.  [Ariba’s Br. at 5:16-18; 6:23-7:4.]  However, as discussed above, the patent does not

23   actually <u>disclose</u> combining the purchase card module with either of the two other modules; that

24   comes only from Ariba’s expert as described below.  In fact, such a combination is unnecessary

25   because the purchase card module can itself transmit an order.  [Shamos Tr., at 77:5-6; 94:4-8.]

26   And therein lies the problem; a person of ordinary skill at the time of the alleged invention, upon

27   reading the patent, is left to guess how to decide whether a purchase card module should be used

28   by itself to transmit an order (as Coupa contends), or whether it should be combined with other

1    ordering modules (as Ariba contends).  Because the patent does not specify how the claimed

2    function is performed, i.e., it fails to disclose the specific algorithm for making the decision, it has

3    failed to disclose sufficient corresponding structure.

4            Tellingly, Ariba only cites its expert—not the patent—when it discusses the possibility of

5    combining a purchase card module with the other modules.  [Ariba's Br. at 6:23-7:7.]  The gist of

6    the declaration is that a person of ordinary skill in the art could have figured out some way to

7    implement the patent.  This is legally insufficient to satisfy the rigors of means-plus-function

8    claiming.  *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed. Cir. 2013) ("Having

9    failed to provide any disclosure of the structure for the 'transmitting' function, FM cannot rely on

10   the knowledge of one skilled in the art to fill in the gaps.").  A "patentee cannot avoid providing

11   specificity as to structure simply because someone of ordinary skill in the art would be able to

12   devise a means to perform the claimed function."  *Id.* (citing *Blackboard*, 574 F.3d at 1385).

13           Finally, contrary to Ariba's contention, the language cited in column 20, lines 5-9, cannot

14   constitute the structure for deciding whether to choose a purchase card module because that

15   language refers to steps performed by the purchase card module itself—*i.e.*, by the time those

16   steps are performed, the decision to use a purchase card module has already been made.  [20:1-9

17   ("The purchasing card module: . . . verifies whether a p-card can be used for this purchase.)]

18                    **2.      "deciding between at least one of a purchase card module, a direct
                               order module, and a purchase order module to submit the electronic
19                             requisition form for fulfillment" (Claims 35, 41)**

20           Ariba contends that this limitation in claims 35 and 41 – which substantially lifts the

21   concededly means-plus-function language of claim 1, and drops the words "means for" – is not

22   governed by 35 U.S.C. § 112(f).  Indeed, there is a rebuttable presumption that § 112(f) is not

23   invoked when the claim language does not contain the word "means."  *Phillips*, 415 F.3d at 1311.

24   However, the "lack of such [means] language does not *prevent* a limitation from being construed

25   as a means-plus-function limitation."  *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1214

26   (Fed. Cir. 1998) (emphasis in original) (affirming that "lever moving element" was subject to

27   section 112(f) because otherwise "a 'moving element' could be any device that can cause the lever

28   to move").  The *Mas-Hamilton* court declined to construe a "'lever moving element' . . . so

                                                    COUPA'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
                                                    Case No. 4:12-cv-01484 WHO

broadly to cover every conceivable way or means to perform the function of moving a lever." *Id.*
Here, too, "deciding between" should not be construed so broadly to cover any conceivable way of
making a decision.  Ariba has already conceded, without argument, that the virtually identical
language in claim 1 is subject to § 112(f), and thus that its requisite structure comes from the
patent's specification – <u>not</u> from the claim language.  It is illogical and inconsistent to argue, as
Ariba does, that claims 35 and 41 recite sufficient structure, while the identical language of claim
1, merely preceded by the words "means for," does not.  The claim language should be subject to
§ 112(f) to conform to Federal Circuit law and to preserve internal consistency.

To the extent this term is subject to § 112(f), the claims are invalid for lack of sufficient
corresponding structure for at least the reasons set forth with respect to the "order generating
means" limitation.  Alternatively, Coupa's proposed function, which mirrors the function set forth
for the "order generating means" limitation, should be adopted as the proper construction.

> **3.** **"approval path handling means for guiding the requisition record along the determined approval path, wherein the approval path handling means generates a global approval indication based on the commentary entry and in response to the requisition record successfully traversing the approval path" (Claim 1)**

| Ariba's Proposed Construction | Coupa's Proposed Construction |
|---|---|
| **Function**: Guiding the requisition record along the determined approval path.<br><br>**Structure**: [*See* Dkt. No. 39-1 (Jt. Claim Construction Chart) at 1-2.] | **Function**: guiding the requisition record along the determined approval path, and generating a global approval indication based on the commentary entry and in response to the requisition record successfully traversing the approval path.<br><br>**Structure**: There is insufficient structure to support the recited function. |

The parties dispute whether the limitation "wherein the approval path handling means
generates a global approval indication based on the commentary entry" should be read out of the
claim (as Ariba contends), and whether the patent discloses sufficient corresponding structure.

When a patent claim includes a "wherein" clause, it limits the scope of the claim if it
"expresses the inventive discovery" rather than "merely stat[ing] the inherent result" of
performing the claimed functionality.  *Intergraph Hardware Techs. Co. v. Toshiba Corp.*, 508 F.
Supp. 2d 752, 768-69 (N.D. Cal. 2007) (citing *Griffin v. Bertina*, 285 F.3d 1029, 1034 (Fed. Cir.

2002)) (construing "wherein" clause as part of the function). Here, the function of "generating a global approval indication based on the commentary entry" is not the inherent result of "guiding the requisition record along the determined approval path." For example, simply guiding a requisition record does not mean that the requisition record will receive global approval (let alone based on the commentary entry). Moreover, the claim does not recite "obtaining" or "receiving" global approval—it recites "generating" an indication of such global approval (based on the commentary entry, no less), a function that can be performed independently of guiding the requisition record. Thus, the "wherein" clause is limiting, and the "approval path handling means" must be construed to perform both recited functions.

Ariba's expert contends that there is no disclosure of a system that generates a global approval indication "based on the commentary entry." [*See* Shamos Tr. at 131:4-7.] Coupa agrees; there is no structure to support Coupa's proposed function, rendering the claim invalid. As for the structure Ariba proposes, it does not save the claim because it is itself functional, i.e., Ariba proposes "software that [performs functions]." *Finisar*, 523 F.3d at 1340-41 ("Simply reciting 'software' without providing some detail about the means to accomplish the function is not enough."). For example, the phrase "pass[ing] the requisition record to the next required approver" in Ariba's proposed structure restates the function of "guiding" with the term "passing"; it does not state how the requisition is guided along a path. As another example, Ariba's excerpt from Figure 3c simply shows that multiple approvals are involved, but again fails to show how the requisition is actually guided from one approver to the next. Citations to black-box functions in the specification provide insufficient support for a means-plus-function limitation. *See, e.g.,* *Blackboard*, 574 F.3d at 1382; *ePlus*, 700 F.3d at 518 (finding "step 114 in Figure 3" to be "just a black box that represents the purchase-order-generation *function* without any mention of a corresponding structure" (emphasis in original)).

Interestingly, Ariba's expert apparently contends that when the claim refers to "generat[ing] a global approval indication based on the commentary entry," it means that a "[human] approver needs to look at the commentary entry in order to decide whether to approve or not approve the requisition." [Shamos Tr., at 127:5-128:13 (emphasis added).] This mixes an

apparatus claim with a method claim—i.e., it requires a human user to approve a requisition based on his review of a commentary entry, a step that can only be satisfied if he actually reviews the commentary entry. Such mixed apparatus-method claims are invalid as a matter of law. *See, e.g., IPXL Holdings, LLC v. Amazon.com*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) ("reciting both an apparatus and a method of using that apparatus renders a claim indefinite").

> **4.** **"approval path determining means, responsive to the requisition record to approval rules in an approval rules database, for determining an approval path for the requisition record, among various ones of a plurality of possible approvers, required to approve the requisition record based on the commentary entry" (Claim 1)**

| Ariba's Proposed Construction | Coupa's Proposed Construction |
|---|---|
| **Function**: Determining an approval path for the requisition record | **Function**: in response to the requisition record to approval rules in an approval rules database, determining which approvers need to approve the requisition record, and in what order, wherein the approvers and order is determined based on the commentary entry |
| **Structure**: [See Dkt. No. 39-1 (Jt. Claim Construction Chart) at 1-2.] | **Structure**: There is insufficient structure to support the recited function. |

The parties dispute four main issues concerning this means-plus-function limitation.

The first issue concerns the recited phrase "based on the commentary entry." Similar to "approval path handling" means limitation, either the system determines the approval path based on the commentary entry (as Coupa proposes), or a human approver must be required to approve a requisition based on the commentary entry (as Ariba apparently proposes). In either case, the claim is invalid as indefinite, either for lack of corresponding structure, or for mixing a system claim with a method claim.

The second issue concerns construing the phrase "determining an approval path." The patent provides scant guidance, but it does mention that "the system checks the approval rules of the company, decides which users need to approve the request, and in what order." [10:61-64.] According to this disclosure, "determining an approval path" refers to "determining which approvers need to approve the requisition record, and in what order."

The third issue concerns the unintelligible phrase "responsive to the requisition record to approval rules in an approval rules database." Ariba contends that it made a scrivener's error

1    when it prosecuted the patent, and relies on one line in the patent and the seven years of

2    prosecution history to support its argument.  Now, over sixteen months after Ariba filed suit,

3    Ariba urges this Court to fix the claim by inserting "and" into the claim.  If Ariba believed this to

4    be a scrivener's error, it should have sought a certificate of correction from the Patent Office to

5    provide the public with notice of the actual scope of claim 1.

6         The fourth issue concerns whether the specification discloses sufficient structure to support

7    the recited function.  There is no dispute that under Coupa's proposed function, there is

8    insufficient corresponding structure, and thus the claim is invalid.  [Shamos Tr. at 131:4-7.]  But

9    even if Ariba's proposed function is adopted, the patent fails to disclose sufficient corresponding

10   structure to support it.  In particular, Ariba contends that "approval software" constitutes sufficient

11   structure because it "inspects the approval rules of the company, [and] decides who needs to

12   approve the request . . . ." [Ariba's Br. at 11:11-23 (quoting the '165 patent at 4:18-22).]

13   However, the patent does not disclose how such "approval software" works, does not disclose the

14   software's specific algorithms as required by law, nor does it disclose any set of approval rules or

15   even how the approval rules are inspected by the "approval software."  [Shamos Tr., at 134:21-

16   135:2 (agreeing the patent "doesn't disclose the rules themselves").]  It simply "describes an

17   outcome, not a means for achieving that outcome." *Blackboard*, 574 F.3d at 1384 (finding

18   description of an "Education support system" insufficient because the language "simply

19   describe[d] the function to be performed" and said "nothing about how the access control manager

20   ensures that those functions are performed" (citing *Aristocrat*, 521 F.3d at 1334)); *see also Net*

21   *MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1365-67 (Fed. Cir. 2008) (rejecting argument that

22   disclosure of a "bank computer" provided sufficient structure under § 112(f)).  Similarly, the box

23   from Figure 3 that Ariba cites to fails to disclose an algorithm because it is only a recitation of an

24   intended result, not a description of how to achieve it.  *ePlus*, 700 F.3d at 518 (finding "step 114 in

25   Figure 3" to be "just a black box that represents the purchase-order-generation *function* without

26   any mention of a corresponding structure" (emphasis in original)).

27        Ariba contends that "one skilled in the art would recognize how . . . the system determines

28   an approval path." [Ariba's Br. at 12:6-8 (citing thirteen paragraphs from Dr. Shamos' declaration

COUPA'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
Case No. 4:12-cv-01484 WHO

1    without explanation).]  Dr. Shamos states that "the full set of approval rules comprise an algorithm

2    which maps any requisition to a valid approval path." [Shamos Decl. at ¶ 63.]  However, in

3    deposition, he admitted that the patent "doesn't disclose the rules themselves." [Shamos Tr. at

4    134:21-2.]  Without the rules, there is no algorithm.  It is irrelevant whether a person of ordinary

5    skill may know algorithms to use to perform the recited function, since Ariba may not claim every

6    possible set of approval rules.  *Blackboard*, 574 F.3d at 1385 ("The correct inquiry is to look at the

7    *disclosure* of the patent . . . not simply whether one of skill in the art would have been able to

8    write such a software program." (emphasis in original)); *ePlus, Inc.,* 700 F.3d at 519 (invalidating

9    system claims where there was "nothing in the specification to help cabin the scope of the

10   functional language in the means for processing element: The patentee has in effect claimed

11   everything that generates purchase orders under the sun.").  Because the patent does not disclose

12   any one algorithm for determining an approval path, claim 1 is invalid.

13            **5.        "requisition record generating means . . ." (Claim 1)**

14            Ariba proposed this term for construction, despite neither party believing it would be case

15   or claim dispositive.  [Dkt. No. 39 (Jt Claim Construction Stmt) at 4:20-23.]  The parties only

16   dispute the structure.  Coupa proposes a structure consisting of the steps disclosed within Box 302

17   of Figures 3a and 3c, and their description in the prose of the specification, wherein the requisition

18   record contains the fields disclosed in Tables 1 and 2.  [*See* Figs. 3a, 3c, 7:35-10:54.]

19            Ariba contends that the requisition is "generated" as soon as a blank requisition record is

20   created, and that the steps for filling out a requisition should be excluded.  [Ariba's Br.at 19:15-

21   20.]  This ignores that claim 1 requires that a requisition be generated in response to "input by a

22   requester including a commentary entry;" simply generating a blank requisition record is

23   insufficient.  Ariba then argues that the steps in Box 302 are not steps for generating a requisition.

24   [Ariba's Br. at 20:13-22.]  But the specification says otherwise: "In FIG. 3, the reference numeral

25   302 designates process steps associated with creating a requisition."  [3:21-23.]

26            Ariba also tries to exclude Tables 1 and 2 from the corresponding structure, arguing that

27   other embodiments are possible.  [Ariba's Br. at 20:23-28 (citing the '165 Patent at 7:2-5).]

28   However, when a patentee chooses to draft a claim in a means-plus-function format, he is limited

1  to the embodiments actually disclosed, not any possible embodiment.  *Ergo Licensing*, 673 F.3d at

2  1363.  Moreover, Ariba omits the portion of the specification explaining that with respect to

3  Tables 1 and 2, "[a]n extrinsic field is an additional custom field" (7:9-16), while "[a]n intrinsic

4  field is a field that the system expects to find" (7:8).  Thus, a requisition record must contain the

5  intrinsic fields shown on Tables 1 and 2.

6              **6.      "electronic receipt generating means . . ." (Claim 1)**

7          Ariba also proposed this term for construction, despite neither party believing it would be

8  case or claim dispositive.  [Dkt. No. 39 at 4:16-19.]  There are two disputes.

9          First, the "wherein" clause should not be excluded from the function because it "expresses

10 the inventive discovery" rather than "merely stat[ing] the inherent result" of performing the

11 claimed functionality.  *Intergraph Hardware*, 508 F. Supp. 2d at 768-69; *Griffin*, 285 F.3d at

12 1034.  Receipts do not inherently "indicate[] one of an acceptance or rejection of a received

13 operating resource," i.e., a receipt does not typically indicates that you rejected something.  Nor do

14 receipts inherently "facilitate[] payment;" indeed, were it otherwise, claim 35 would not recite

15 "generating an electronic receipt" and "facilitating payment" as two separate claim limitations.

16         Second, the structure for performing the claimed function should be construed as

17 "providing an employee with a form having the fields shown in Table 15, where the form allows

18 an employee to take the steps 1(a)-(b) disclosed on col. 21, lines 56-67."  [Dkt. No. 39-1 (Jt Claim

19 Construction Chart) at 7-8.]  The specification discloses that "[t]he system provides a simple form

20 (the fields of which are shown below in Table 15) for the employee to indicate that he or she has

21 physically received an item" (21:52-54), and then describes the steps an employee can take to

22 acknowledge receipt of an ordered item (21:56-67).  The fields in Table 15 are not described as

23 optional, and consist of the only embodiment disclosed for generating a receipt.

24         Ariba contends there is another embodiment for generating a receipt, but what Ariba

25 cites—"user interface for acknowledging receipt, which allows employees to acknowledge that

26 various items have been received"—hardly constitutes an algorithm because it would cover any

27 user interface without regard to how it actually operates.

28

1    Dated:  July 26, 2013                    FISH & RICHARDSON P.C.

2
                                             By:  */s/ Enrique D. Duarte*
3                                                 Enrique D. Duarte

4                                            Attorney for Defendant
                                             COUPA SOFTWARE INC.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28